UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

BLOOMINGBURG JEWISH EDUCATION
CENTER et al.,

                                        Plaintiffs,

                        -v-                                14-cv-7250 (KBF)

VILLAGE OF BLOOMINGBURG, NEW YORK et          OPINION & ORDER
al.,

                                        Defendants.

------------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 9, 2015

KATHERINE B. FORREST, District Judge:

        Bloomingburg is a small, rural village in Sullivan County with a population of about 400 residents.  Over the past several years, Hasidic Jews have been moving into the village in increasing numbers.  The complaint in this action alleges that this influx of Hasidic Jews has been met with determined and concerted resistance by the local governments and public officials of the Village of Bloomingburg and the Town of Mamakating, who are defendants in this action.  Plaintiffs allege that defendants' acts of resistance have violated their rights under the First Amendment, the Equal Protection Clause, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Fair Housing Act ("FHA"), and New York state law.  Defendants vigorously deny plaintiffs' assertions.  Now pending before the Court are defendants' motions to dismiss.  (ECF Nos. 67, 71.)

        For the reasons set forth below, those motions are GRANTED IN PART AND DENIED IN PART.  Plaintiffs Malka Rosenbaum and Winterton Properties, LLC

have stated plausible claims for relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against defendants the Town of Mamakating, the Zoning Board of Appeals of the Town of Mamakating, and William Herrmann in his official capacity based on these defendants' alleged roles in stymying the conversion of a property in Bloomingburg into a mikvah, a bath used by Hasidic Jews for ritual immersion and purification. Plaintiff Sullivan Farms II, Inc. has stated plausible claims for relief under § 1983, § 1985, and the FHA against defendants the Village of Bloomingburg, New York, the Village Board of Trustees of the Village of Bloomingburg, Frank Gerardi in his official capacity, James Johnson in his official capacity, and Katherine Roemer in her official capacity based on these defendants' alleged roles in obstructing the completion of a housing development project known as Chestnut Ridge.  Plaintiffs' other claims are dismissed.

Accordingly the claims of plaintiffs the Bloomingburg Jewish Education Center, Learning Tree Properties, LLC, Sheindel Stein, and Commercial Corner, LLC are dismissed in their entirety, as are all claims against defendants the Planning Board of the Village of Bloomingburg, the Town Board of the Town of Mamakating, the Planning Board of the Town of Mamakating, Andrew Finnema, Ann Heanelt, Joseph B. Roe, and Eileen Rogers.  All individual-capacity claims against defendants Frank Gerardi, Katherine Roemer, James Johnson, and William Herrmann are also dismissed on immunity grounds.

I.    FACTUAL BACKGROUND[1]

In the First Amended Complaint (ECF No. 43 ("FAC")), plaintiffs allege that defendants are working together to prevent Hasidic Jews from moving into the vicinity of Bloomingburg, New York, a small village in Sullivan County with a population of about 400 (FAC ¶ 72).  In particular, the First Amended Complaint alleges that defendants are (a) obstructing the completion of a housing development project known as Chestnut Ridge, which they believe is being marketed to Hasidic home buyers, (b) impeding the opening of the Bloomingburg Jewish Education Center, a private Hasidic religious school that plans to open on Bloomingburg's Main Street, (c) preventing a property in Bloomingburg from being converted to a mikvah, a bath used by Hasidic Jews for ritual immersion and purification, and (d) engaging in a program of harassment and discriminatory building code enforcement aimed at Jewish residents or prospective residents of Bloomingburg.

A.    The Parties

The plaintiffs in this action are: Sullivan Farms II, Inc. ("Sullivan Farms"); the Bloomingburg Jewish Education Center; Learning Tree Properties, LLC ("Learning Tree"); Malka Rosenbaum; Sheindel Stein; Winterton Properties, LLC ("Winterton Properties"); and Commercial Corner, LLC ("Commercial Corner").

---

[1] In deciding the pending motions, the Court is legally required to accept as true all of plaintiffs' allegations, and to draw all reasonable inferences in their favor.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57); N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 121 (2d Cir. 2013).  Of course, the Court recognizes that defendants vigorously contest any allegations that their actions were motivated by bigotry, prejudice, or other improper motives.  However, at this stage of the proceedings the law requires that this Court accept the allegations as true.  Whether these allegations are in fact true, false, or misleading is something that must be resolved only at the later stages of this litigation.

Sullivan Farms is a New York corporation, and the record owner of the Chestnut Ridge properties.  (FAC ¶ 23.)  The Bloomingburg Jewish Education Center is a not-for-profit religious trust that seeks to open and operate a private Hasidic religious school (also named the Bloomingburg Jewish Education Center, to which the Court will refer as the "BJEC" or the "religious school") at 132 Main Street in Bloomingburg.  (FAC ¶¶ 4, 22.)  Learning Tree, a New York limited liability company, is the record owner of the BJEC property.  (FAC ¶ 24.)  Malka Rosenbaum and Sheindel Stein are Jewish residents of Bloomingburg who would like to send their children to school at the BJEC.  (FAC ¶¶ 25-26.)  Winterton Properties is a New York liability company that is the record owner of a property on which it seeks to build and operate a mikvah.  (FAC ¶ 28.)  Commercial Corner is a New York limited liability company that is the record owner of a retail building located at 79 Main Street in Bloomingburg, at which a hardware store plans to open.  (FAC ¶¶ 27, 157.)

The defendants in this action can be separated into two groups.  The first consists of entities and individuals associated with the Village of Bloomingburg (the "Village Defendants").  The second consists of entities and individuals associated with the Town of Mamakating (the "Town Defendants.")

The Village Defendants consist of the Village of Bloomingburg and constituent local municipal entities (the "Village Municipal Defendants") and several individuals who have held positions in the Village government (the "Village Individual Defendants").  The Village Municipal Defendants are: the Village of

Bloomingburg, New York (the "Village"), a political subdivision of the State of New York (FAC ¶ 29); the Village Board of Trustees of the Village of Bloomingburg (the "Village Board of Trustees"), the Village's legislative body (FAC ¶ 30); and the Planning Board of the Village of Bloomingburg (the "Village Planning Board"), which was dissolved by Village Local Law No. 4 of 2014 (FAC ¶ 33).

The Village Individual Defendants are Frank Gerardi, Eileen Rogers, Katherine Roemer, James Johnson, Andrew Finnema, Ann Heanelt, and Joseph B. Roe. Gerardi is the mayor of Bloomingburg. (FAC ¶ 12, 31.) He was elected in 2014 after allegedly campaigning on a platform that openly opposed Hasidic Jews moving into Bloomingburg. (FAC ¶ 12.) He is alleged to have made several anti-Semitic statements and to have verbally harassed members of the Hasidic community. (FAC ¶ 133.) Rogers is the Village Clerk. (FAC ¶¶ 16, 32.) She is alleged to have acted in concert with Gerardi to direct the Village's building inspector to engage in the discriminatory enforcement of Village regulations against Hasidic Jewish property owners and residents. (FAC ¶ 16.) Roemer and Johnson are Village trustees. (FAC ¶¶ 20, 41-42.) Finnema, Heanelt, and Roe were members of the Village Planning Board at the time the site plan application for the religious school was denied. (FAC ¶¶ 34-36.)

The Town defendants are: the Town of Mamakating, New York (the "Town"), a political subdivision of the State of New York (FAC ¶ 37); the Town Board of the Town of Mamakating (the "Town Board"), the Town's legislative body, which assumed the authority of the Village Planning Board following the passage of

Village Local Law No. 4 of 2014 (FAC ¶ 38); the Zoning Board of Appeals of the Town of Mamakating (the "Town ZBA") (FAC ¶ 39); the Planning Board of the Town of Mamakating (the "Town Planning Board") (FAC ¶ 40); and William Herrmann, the Town Supervisor (FAC ¶ 43).  Herrmann and the Village Individual Defendants have each been sued in both their individual and official capacities.

Another entity that figures prominently in the First Amended Complaint, but which is neither a plaintiff nor a defendant in this action, is the Rural Community Coalition (the "RCC").  The RCC is an advocacy organization co-founded by Herrmann and several other area residents.  (FAC ¶ 59.)  The First Amended Complaint alleges that the RCC's publicly stated advocacy positions are in fact fig leaf justifications for their true agenda: blocking Hasidic Jews from moving into Bloomingburg, and making life difficult for those who already live there.  (See FAC ¶¶ 59, 61, 65.)  Several of the public officials named as defendants in this action, specifically Gerardi, Johnson, Roemer, and Herrmann, were elected with RCC support.  (See FAC ¶¶ 72-73.)  The First Amended Complaint also alleges that Herrmann has sought to advance the RCC's cause by appointing "a number of vocal opponents of the Jewish community" to "various town boards," including an appointee to the Town Planning Board and the chair of the Town ZBA.  (FAC ¶¶ 139, 147.)

B.    <u>Chestnut Ridge</u>

Plaintiff Sullivan Farms is currently developing Chestnut Ridge,[2] a subdivision located about a half-mile from the center of Bloomingburg consisting of 396 townhomes, a community clubhouse, and recreational amenities.  (FAC ¶ 47.) Chestnut Ridge has been in development since 2006, when the Village annexed the 198-acre property on which it is being built from the Town following a public meeting.  (FAC ¶¶ 49-51.)  The plans were made public in 2008, after which Sullivan Farms began the lengthy multi-year process required for gaining the necessary initial regulatory approvals for building the development, including approval of the site plan and subdivision and an environmental review.  (FAC ¶¶ 51-52.)  Each of these steps was completed between July 2009 and June 2010.  (FAC ¶¶ 52, 54-55.)

According to plaintiffs, Chestnut Ridge initially enjoyed broad support from the Bloomingburg community.  (<u>See</u> FAC ¶¶ 53-54.)  However, in 2012 opposition arose after rumors spread that the townhomes were being marketed to Hasidic Jews.  (FAC ¶¶ 53, 57-58.)  At this time, several local residents, including future Town Supervisor Herrmann, banded together to form the RCC, which then filed a lawsuit seeking to block the project.  (FAC ¶¶ 59-62.)  In addition, several residents publicly expressed concern about the prospect of Hasidic Jews moving into their community.  For instance, at the May 17, 2012 public meeting of the Village trustees, a former Village trustee, Clifford Teich, asked the Village attorney, John

---

[2] The official name for the development is "Village of Chestnut Ridge."  (FAC ¶ 49.)

Kelly, if there was a way to ensure that no Hasidic residents would move into the project, to which Kelly responded "[i]t's insane that you just asked me that question."  (FAC ¶ 58.)  RCC president Holly Roche also stated that there was no opposition to Chestnut Ridge until 2012 because before "that point in time, it was not known that the developer planned a Hasidic community."  (FAC ¶ 59.)

In June 2013, Sullivan Farms applied for building permits for the first phase of Chestnut Ridge, and between July and November 2013 the Village granted 126 building permits.  (FAC ¶ 63.)  Between January 2014 and March 2014, several individuals who had campaigned on an allegedly anti-Hasidic platform took public office or were elected to public office in the Village and the Town, including Gerardi as Village mayor, Johnson and Roemer as Village trustees, and Herrmann as Town Supervisor.  (FAC ¶¶ 12, 72-73.)

In February 2014, the New York State Supreme Court granted the RCC's request for a preliminary injunction enjoining nearly all construction on the Chestnut Ridge project site.  (FAC ¶ 77.)  The Town, under Herrmann's leadership, and the Village, under Gerardi's leadership, had publicly supported the injunction. (FAC ¶ 75.)  The injunction was struck down by the Appellate Division of the New York Supreme Court on June 5, 2014.  (FAC ¶ 77.)

The Village Board of Trustees (then comprised of Gerardi, Johnson, and Roemer) responded on June 12, 2014 by passing a moratorium on the issuance of building permits in Bloomingburg (the "Moratorium").  (FAC ¶¶ 13, 78-79, 243, 280,

299, 308, 310, 363.)  The Moratorium, which was promulgated pursuant to a

message of necessity from Mayor Gerardi (FAC ¶ 79), states that it is intended to

> allocate limited Village resources toward the investigation
> of a substantial number of complaints about the reported
> and documented failure of some residential and
> commercial owners and contractors to comply with the
> dictates of [local, state, and federal laws and regulations],
> which non-compliance poses an immediate and
> substantial risk to the health, safety, and welfare of those
> living and working in the Village.

(Declaration of Jody T. Cross, ECF No. 69 ("Cross Decl.") ex. C.)  The First Amended

Complaint alleges that this statement is misleading, because in opposing litigation

over the Moratorium, the Village relied almost entirely on complaints submitted

after the Moratorium was enacted, none of which concerned new construction.

(FAC ¶ 81.)  The Moratorium also states that it is intended to "allow the Village

Board to undertake a comprehensive review of the Zoning Law of the Village of

Bloomingburg and permit the Village Board to review, update, and potentially

amend same."  (Cross Decl. ex. C.)  The Moratorium was enacted for 90 days, with

the possibility of three additional 90-day extensions; it will expire on June 11,

2015.[3]  (FAC ¶ 14; Cross Decl. ex. C; ECF No. 68 at 3.)

    The First Amended Complaint alleges that the Moratorium prevents the

construction of housing units with kosher kitchens and "all of the necessary

religious requirements."  (FAC ¶¶ 87, 279-80.)  It also alleges that Gerardi, Rogers,

and Village Code Enforcement Officer Joseph Smith work together to enforce the

---

[3] While outside the four corners of the First Amended Complaint, counsel for the Village represented
to the Court at oral argument on April 24, 2015 that the Moratorium would expire on June 11, 2015,
implying that it would not be renewed.  (Transcript of Oral Argument on April 24, 2015, ECF No.
130 ("Tr.") 13:5-9, 14:10-14.)

Moratorium on a daily basis (FAC ¶ 365), though it does not describe how exactly they do so.

Sullivan Farms and its affiliates are responsible for most, if not all, current building activities in the Village.  (FAC ¶ 13.)  Sullivan Farms has submitted approximately 80 additional building permit applications, which are still pending and have not been acted on.[4]  (FAC ¶¶ 86-87, 335.)  To date, Sullivan Farms has completed 51 townhome units, and counsel for plaintiffs represented at oral argument that all of these units remain unsold and unoccupied.[5]  (FAC ¶ 63; Tr. 43:5-8; see also Tr. 15:18-20.)  Sullivan Farms alleges that the Village's failure to respond to its requests for certificates of occupancy for the completed townhouses explains why sales for the townhomes cannot be closed and why they remain unoccupied.  (FAC ¶¶ 48, 64.)  The First Amended Complaint also alleges that a landowner erected a 20-foot high wooden cross adjacent to the site.[6]  (FAC ¶¶ 2, 69.)

C.   The Religious School

Since 2013, plaintiffs the Bloomingburg Jewish Education Center and Learning Tree have sought to build and operate the BJEC, a Hasidic Jewish religious school for children, on Bloomingburg's Main Street.  (FAC ¶¶ 4, 93.) Plaintiffs Rosenbaum and Stein wish to send their children to the BJEC, and if the

---

[4] This factual allegation is consistent with the representation at oral argument by counsel for the Village that 310 of the 396 building permits sought by Sullivan Farms have been issued.  (Tr. 15:13-18.)

[5] At oral argument, counsel for the Village represented that Sullivan Farms has "contracts on these 50 units."  (Tr. 69:1-5.)  The Court notes that at present it has no reason to assume that plaintiffs have failed to comply with Federal Rule of Civil Procedure 11, and at this stage of the litigation accepts plaintiffs' allegations as true.

[6] At oral argument, counsel for the Village represented that the cross was not constructed by the Village or a Village official.  (Tr. 69:15-17.)

BJEC is not available, they will homeschool their children or send them to a Jewish school in another town.  (See FAC ¶¶ 122-24.)

In July 2013, Learning Tree submitted a site plan application for the school. (FAC ¶ 93.)  The plan calls for a building currently constructed for use as an antique car garage to be converted into a schoolhouse, and also calls for the property's driveway and parking lot to be modified in order to accommodate school buses.  (FAC ¶¶ 4, 92-93.)  The first two times the Village Planning Board met to discuss Learning Tree's application, on August 29, 2013 and September 26, 2013, they were confronted with what Herrmann called "an angry mob scene," and protesting residents of the Village refused to allow the Board to vote on the application.  (See FAC ¶¶ 5, 96-101.)  At a third hearing on December 12, 2013, and with police present to control the crowd, the Village Planning Board agreed that the application was complete, and then rejected it, to cheers from the crowd.  (FAC ¶¶ 5, 104-08.)

Learning Tree challenged the denial in an Article 78 proceeding in the New York State Supreme Court.  (FAC ¶¶ 7, 109.)  In a two-page order dated May 12, 2014, the New York Supreme Court annulled the Village Planning Board's denial of the site plan application for the BJEC and ordered the Village Planning Board to issue a decision on the site plan application within 30 days and without first holding a public hearing.  (FAC ¶ 110; ECF No. 72 ("Dorfman Decl.") ex. B.)  The court later extended the deadline to June 30, 2014.  (FAC ¶ 110.)

However, instead of issuing a decision on the site plan application, on June 12, 2014, Gerardi, Johnson, and Roemer dissolved the Village Planning Board and the Village Zoning Board of Appeals, and authorized the Village to delegate those entities' responsibilities to the Town.  (FAC ¶¶ 7, 179, 200.)  On June 17, 2014, the Town agreed, in a document signed by Gerardi and Herrmann (the "inter-municipal agreement" or "IMA"), to assume those responsibilities and accept jurisdiction over the school's site plan application.  (FAC ¶¶ 114, 179-80, 202, 222, 246, 267, 299, 301, 308, 310, 312.)  The Town then restarted the site plan review process.  (FAC ¶¶ 115-20.)

The First Amended Complaint alleges that the Town Planning Board has subsequently used various methods to deliberately stall making a final decision on the project.  (See FAC ¶¶ 8, 181.)  This process was ongoing as of the time that plaintiffs filed the First Amended Complaint, and the BJEC has yet to open.  (FAC ¶ 8.)  However, at oral argument on these motions on April 24, 2015, counsel for defendants represented that the site plan for the school was approved in March 2015—and public records of which this Court may take judicial notice confirm this. (Tr. 10:6-8, 26:19-22, 28:25-29:3; see also Town of Mamakating, Planning Board Meeting March 24, 2015 – 7:00 P.M., http://mamakating.org/ townmeetingsdetail.php?03-24-2015-853 (last visited May 25, 2015) (listing school site plan approval on agenda for March 24, 2015 Town Planning Board meeting).)

D.   The Mikvah

At present, there is no mikvah in Bloomingburg, and plaintiff Rosenbaum alleges that she is burdened by not having a mikvah in Bloomingburg because she

must pay someone to drive her a considerable distance to get to one.[7]  (See FAC ¶ 167.)  To serve the needs of the area's growing Hasidic community, plaintiff Winterton Properties seeks to open a mikvah in a building at 51 Winterton Road in Mamakating, which was formerly used as a day spa as well as a residence.  (FAC ¶¶ 18, 135.)  This property is located in the Village Center Zoning District, an area that permits a wide array of uses, including both commercial use and use as a "neighborhood place of worship."  (FAC ¶ 18.)

In December 2013, Winterton Properties applied for site plan approval for the mikvah.  (FAC ¶ 136.)  As explained above, between January 2014 and March 2014, Gerardi, Herrmann, Johnson, and Roemer took public office or were elected to public office.  (FAC ¶¶ 12, 72-73.)  The First Amended Complaint alleges that in January 2014, Herrmann and another Town official entered the mikvah property without permission and inspected it.  (FAC ¶ 136.)  Afterward, the Town issued a stop-work order to Winterton Properties, on the ground that Winterton Properties was making improvements without a permit.  (FAC ¶ 136.)

On May 12, 2014, the Town's building inspector, after consulting with the attorney for the Town Planning Board, concluded that the use of the property as a mikvah was permitted as of right under the Town's Zoning Local Law as a neighborhood place of worship.  (FAC ¶¶ 19, 137.)  The Town Planning Board approved the site plan for the property on July 3, 2014, and Winterton Properties

---

[7] The First Amended Complaint states that the Village received complaints that a private residential pool and/or Jewish-owned buildings were being used as a mikvah.  (FAC ¶¶ 15, 84.)  Nevertheless, the First Amended Complaint alleges that there is no mikvah available for use in Bloomingburg. (See FAC ¶ 167.)

then applied for demolition and building permits.  (FAC ¶ 138.)  Occupants of neighboring properties filed an appeal to the Town ZBA, arguing that a mikvah was not an approved use of the property.  (FAC ¶¶ 19, 139.)  The Town ZBA then reversed the Town building inspector's determination, and ruled that a mikvah is not a neighborhood place of worship, allegedly without providing a reasoned basis for this conclusion, or explaining how a mikvah would be classified.  (FAC ¶¶ 19, 140.)

On December 23, 2014, Winterton Properties filed an Article 78 proceeding in the New York State Supreme Court against the Town ZBA challenging the determination as to the mikvah.  Winterton Props., LLC v. Town of Mamakating Zoning Bd. of Appeals, No. 2014-2882 (N.Y. Sup. Ct. Dec. 23, 2014).  The state court denied the petition, and an appeal is pending before the New York Supreme Court, Appellate Division, Third Judicial Department.  See Matter of Winterton Props. LLC v. Town of Mamakating Zoning Bd. of Appeals, Motion No. 520885, 2015 WL 1947567 (N.Y. App. Div. Apr. 27, 2015).

E.    Conspiracy, Discriminatory Code Enforcement, and Other Allegations

The First Amended Complaint alleges a conspiracy among the Village Defendants and the Town Defendants to prevent Hasidic Jews from moving into the Bloomingburg area.  Herrmann and Gerardi are alleged to be ringleaders of this scheme.  As explained above, Herrmann took office as Town Supervisor in January 2014.  (FAC ¶ 72.)  Herrmann campaigned on the slogan "stop 400 from turning into 4000," and he is alleged to have said that he was elected to "stop the Jewish infiltration," and that he wanted to "keep Jews out of the area."  (FAC ¶¶ 20, 72.)

14

In March 2014, several RCC-backed candidates were elected to public office in the Village: Gerardi as mayor, and Johnson and Roemer as trustees.  (FAC ¶ 73.) It is alleged that each had run on a platform of stopping Hasidic Jews from moving into the Village.  (FAC ¶ 73.)  Gerardi allegedly declared that he was elected to keep "those people" out and to condemn Jewish-owned buildings.  (FAC ¶ 20.)  He is also alleged to have referred to Jewish people as "those people" or "those things."  (FAC ¶¶ 150, 157.)  Johnson is alleged to have repeatedly referred to Hasidic women in derogatory terms and to have voiced his objection to their pushing baby carriages on streets in the Village.  (FAC ¶ 20.)

The First Amended Complaint alleges that since the 2014 elections, the Village has engaged in a campaign of harassment and discriminatory building code enforcement aimed at Jewish residents and prospective residents of Bloomingburg. After Gerardi's election, the Village replaced the Village engineer, Tom Depuy, allegedly because he refused to condemn Jewish-owned buildings.  (FAC ¶ 149.) The Village then cycled through three building inspectors and three code enforcement officers, allegedly because the Village was looking for ones that would act to block Chestnut Ridge and other Jewish developments.  (FAC ¶ 149.)

In addition, the First Amended Complaint alleges that the Village has discriminatorily enforced building codes and regulations against Jewish-owned properties and issued frivolous stop-work orders, at the urging of Gerardi, Rogers, and Johnson.  (See FAC ¶¶ 133, 149-65.)  For instance Gerardi, Rogers, and Johnson allegedly instructed former code enforcement officer Todd Korn to more

15

strictly enforce land-use rules against Hasidic Jews' properties.  (FAC ¶ 150.)  The First Amended Complaint further alleges on August 18, 2014, Gerardi trespassed onto Learning Tree's property in order to question a hydrogeologist who was drilling an exploratory potable water well; the Village subsequently issued a stop-work order on the property for the drilling of water supply test wells without a permit, even though no such permitting requirement was in force.  (See FAC ¶¶ 153, 155.)  Learning Tree alleges that this stop-work order has further delayed the opening of the religious school.  (FAC ¶ 156.)

In contrast, a non-Jewish-owned property in the Village has been allowed to continue operating despite alleged code violations.  (FAC ¶ 164.)  On one occasion, Rogers allegedly advised Korn to ignore a complaint against a non-Jewish-owned property because the owner was "one of us," meaning not Jewish.  (FAC ¶ 151.)  The Village has also allegedly hired a new code enforcement officer who is Gerardi's friend and who has been assisting Gerardi in obstructing "'Jewish' building in the Village."  (FAC ¶ 152.)

Plaintiff Commercial Corner's property at 79 Main Street is alleged to have been a particular target of the Village Defendants' efforts.  On one occasion when Gerardi saw Hasidic Jews entering that property, he instructed Korn to throw "those things out," to which Korn responded that he could not prevent the owners of the building from entering and exiting.  (FAC ¶ 157.)  Korn did, however, issue a stop-work order for the property, which is stayed pending a decision on appeal.  (FAC ¶¶ 157-58.)  A second stop-work order that allegedly prevents people from

entering the property issued on August 20, 2014; no rationale for the stop-work order was given, and the Village has declined to issue any clarifying information. (FAC ¶ 158.)  On another occasion, when a group of 100 Jewish students on a field trip in the Catskill Mountains sought to use the property as a meeting place for morning prayers, which take approximately forty minutes, a building code enforcement officer ordered them to vacate the building and threatened to call the State Police.  (FAC ¶ 160.)  Plaintiffs also allege that the Village deliberately delayed the opening of a kosher pizza restaurant, although it is unclear where the pizza restaurant is located or who owns it.[8]  (FAC ¶¶ 161-63.)

The First Amended Complaint contrasts the alleged treatment of Jewish-owned properties with that of a non-Jewish-owned property on which a business sought to change a warehouse space to a retail store known as the Quickway Thrift Shop.  (See FAC ¶ 164.)  The conversion has allegedly been allowed to proceed even though the owners have not obtained approvals or necessary permits, the size of the shop's sign violates Village regulations, and a number of complaints have been submitted to the Village.  (FAC ¶ 164.)  Although the Village has issued a stop-work order to the Quickway Thrift Shop, it remains open for business.  (FAC ¶ 164.)

Plaintiffs also allege that the Village is now conspiring with the Town to dissolve itself, which would allow the Town to control all affairs previously conducted by the Village.  (FAC ¶ 128.)  In May 2014, the Village received proposals for professional services to conduct an urgent dissolution study, and around that

---

[8] The First Amended Complaint alleges that "[p]laintiffs have tried to open a pizza restaurant," but it does not specify which plaintiffs.  (See FAC ¶¶ 161-63.)

time the RCC initiated a dissolution petition, which was signed by Gerardi and two Village trustees.  (FAC ¶¶ 129, 131.)  The Village Board scheduled a referendum vote on the RCC's dissolution petition for September 30, 2014, during the Jewish High Holy Days.  (FAC ¶ 132.)  It is evident from the Village's continued existence that the vote failed.

## II.    PROCEDURAL BACKGROUND

Plaintiffs commenced this litigation on September 8, 2014.  (ECF No. 1.)  The case was initially assigned to Judge Cathy Seibel.  On October 7, 2014, plaintiffs moved for a preliminary injunction prohibiting the Village Defendants from enforcing the Moratorium.  (ECF No. 7.[9])  The Court orally denied the motion at a hearing on November 13, 2014.  (Cross Decl. ex. D 18:2-10.)

Plaintiffs filed the First Amended Complaint on November 26, 2014.  (FAC.) The First Amended Complaint asserts fifteen repetitive causes of action.[10]  (FAC ¶¶ 171-370.)  In Causes of Action One, Two, Three, Four, and Five, the Bloomingburg Jewish Educational Center, Learning Tree, Rosenbaum, Stein, and Winterton Properties assert claims against all defendants under RLUIPA, 42 U.S.C. § 2000cc

---

[9] Plaintiffs filed an amended motion for a preliminary injunction on October 7, 2014.  (ECF No. 11.)

[10] The Court's description of the causes of action is based on the First Amended Complaint, plaintiffs' representations at oral argument on April 24, 2015, and the chart submitted by plaintiffs on April 27, 2015.  (ECF No. 121 ex. 1.)  Because plaintiffs were expressly granted leave to file the chart by the Court at oral argument, defendants' argument that the Court should not consider the chart when deciding the pending motions lacks merit.  The chart cannot, of course, amend the First Amended Complaint—but given the number of claims and allegations, it provides a useful reference tool as to that which has been alleged.  To the extent the chart's content exceeds the pleadings, the Court ignores it.  Further, the Court disregards any allegations in the chart that are unsupported by citation to the pleadings.

et seq., relating to the religious school.[11]  (FAC ¶¶ 171-276; ECF No. 121.)  In Causes of Action Six and Seven, plaintiffs Sullivan Farms, Rosenbaum, and Stein assert claims against the Village, the Village Board of Trustees, Gerardi, Rogers, Roemer, and Johnson under the FHA based on the allegations relating to Chestnut Ridge.  (FAC ¶¶ 277-95; ECF No. 121.)  In Causes of Action Eight, Nine, Eleven and Twelve, all plaintiffs assert various federal constitutional claims against all defendants based on alleged religious discrimination relating to the school, the mikvah, Chestnut Ridge, and the alleged conspiracy regarding the discriminatory and arbitrary enforcement of the Village's land use scheme.  (FAC ¶¶ 296-316, 332-48; ECF No. 121.)  In Cause of Action Ten, all plaintiffs assert a federal due process claim against the Village, the Village Board of Trustees, Gerardi, Johnson, Roemer, and Rogers based on their allegations relating to the Moratorium and the discriminatory and arbitrary enforcement of the Village's land use scheme.  (FAC ¶ 317-31; ECF No. 121.)  In Cause of Action Thirteen, all plaintiffs assert a § 1985 civil rights conspiracy claim against all defendants.  (FAC ¶¶ 349-54; ECF No. 121.)  In Causes of Action Fourteen and Fifteen, plaintiffs assert claims under New York state law that mirror plaintiffs' federal claims under Causes of Action Eight through Thirteen.  (See FAC ¶¶ 355-70; ECF No. 121.)  Plaintiffs seek damages, injunctive relief, costs, disbursements, and attorneys' fees.  (FAC.)

---

[11] The Court declines to construe plaintiffs' RLUIPA claim as asserted based on the allegations relating to the mikvah.  Although plaintiffs have at several points stated that their RLUIPA claims are predicated in part on the mikvah allegations (see, e.g., FAC ¶¶ 182-88, ECF No. 121 ex. 1 at 2-3; Tr. 43:23-44:2), plaintiffs have never adequately explained how the mikvah allegations are sufficient to support a claim under that statute—indeed, this point was barely covered in plaintiffs' opposition briefs or at oral argument.  It is not this Court's duty to connect the necessary dots for plaintiffs.  Plaintiffs' allegations regarding the mikvah are insufficient to support a RLUIPA claim.

On February 27, 2015, this litigation was reassigned to the undersigned. Defendants filed the instant motions to dismiss on March 5, 2015.  (ECF Nos. 67, 71.)  Plaintiffs submitted their opposition that same day.  (ECF Nos. 70, 74.) Defendants submitted reply briefs on March 13, 2015.  (ECF Nos. 80, 82.)

On April 24, 2015, the Court held oral argument on the motions.  At oral argument, the Court granted plaintiffs leave to file a chart summarizing the fifteen causes of action in the First Amended Complaint; plaintiffs submitted the chart on April 27, 2015.  (ECF No. 121.)  On April 28, 2015, plaintiffs submitted a letter addressing several questions on legislative immunity raised by the Court during oral argument.  (ECF No. 122.)  On April 29, 2015, defendants submitted a letter in opposition to the chart.  (ECF No. 123.)  The Court then, in an order dated April 30, 2015, informed the parties that it would not accept further submissions on the pending motions to dismiss.  (ECF No. 124.)  Defendants requested permission to file a letter in response to plaintiffs' April 28, 2015 letter on legislative immunity, and the Court denied the request.  (ECF No. 126.)

III.    MOTION TO DISMISS STANDARD

    A.    Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Starr v. Sony BMG Music Entm't, 592

F.3d 314, 321 (2d Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 570); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 678 (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 129 S. Ct. at 1949.

The Court must accept as true—for purposes of this motion only—the facts as alleged in the pleadings, and the Court must draw all inferences in plaintiffs' favor. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555-57).  Thus, if a fact is susceptible to two or more competing inferences, in evaluating these motions, the Court must, as a matter of law, draw the inference that favors the plaintiff so long as it is reasonable.  <u>N.J. Carpenters</u>, 709 F.3d at 121.  "[T]he existence of other, competing inferences does not prevent the plaintiff[s'] desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an obvious alternative explanation." <u>Id.</u> (internal quotation marks omitted).[12]

The Court does not, however, credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  <u>Id.</u>  If the court can infer no more than "the mere possibility of misconduct" from the factual averments—in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 129 S. Ct. at 1950).

---

[12] In their briefs, defendants argue that many of the allegations in the First Amended Complaint are false or misleading.  However, at this stage plaintiffs are entitled to reasonable inferences being drawn in their favor.  Discovery may make clear that there either is or is not a triable issue as to plaintiffs' claims.

B. <u>Judicial Notice</u>

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, <u>Rothman v. Gregor</u>, 220 F.3d 81, 88 (2d Cir. 2000), as well as documents that are integral to the complaint and relied upon in it, even if not attached or incorporated by reference, <u>Broder v. Cablevision Sys. Corp.</u>, 418 F.3d 187, 196 (2d Cir. 2005). The Court may also properly consider matters of public record of which it may take judicial notice. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) (a court may consider "matters of which a court may take judicial notice" on a Rule 12(b)(6) motion to dismiss); <u>Blue Tree Hotels. Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records . . . in deciding a motion to dismiss.").

Under Federal Rule of Evidence 201, the Court may take judicial notice of a fact if it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). When the Court takes judicial notice of a document, it takes notice of the document's existence, not the truth of the statements asserted in the document. <u>Global Network Commc'ns, Inc. v. City of New York</u>, 458 F.3d 150, 157 (2d Cir. 2006). "Facts admitted by a party are judicial admissions that bind that party throughout the litigation." <u>Hoodho v. Holder</u>, 558 F.3d 184, 191 (2d Cir. 2009) (internal quotation marks and alterations omitted).[13]

---

[13] Rule 8 provides that a defendant is entitled to notice of the claims brought against him, Fed. R. Civ. P. 8(a), and <u>Twombly</u> makes clear that at the pleading stage in a conspiracy case, that means

IV.    DISCUSSION

    A.    <u>Threshold Issues</u>

        1.    <u>Abstention.</u>

The Town Defendants argue that the Court should abstain from hearing plaintiffs' claims relating to the mikvah in light of Winterton Properties' pending Article 78 challenge to the Town ZBA's decision.  The Court declines to do so, as the instant litigation and the pending state court action concerning the mikvah involve different rights and different remedies, and no factors counsel toward abstention here.

Under the abstention doctrine first set forth by the Supreme Court in <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976), in certain "exceptional circumstances, a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in comprehensive disposition of litigation and abstention would conserve judicial resources." <u>Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.</u>, 673 F.3d 84, 100 (2d Cir. 2012) (citations and internal quotation marks omitted).  "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." <u>Id.</u> (quoting <u>Dittmer v. County of Suffolk</u>, 146 F.3d 113, 118 (2d Cir. 1998)).

---

that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose, <u>see</u> <u>Twombly</u>, 550 U.S. at 557–58.  Defendants argue that the First Amended Complaint should be dismissed on the sole ground that the First Amended Complaint is unclear as to which claims plaintiffs are asserting against which defendants.  While the First Amended Complaint casts a broad net and is not a model of clarity, it is not so deficient in this regard so as to justify dismissal under Rule 8.

First, the instant litigation and Winterton Properties' pending Article 78 challenge are not duplicative, as they involve different rights and different remedies. In that Article 78 proceeding, Winterton Properties seeks the reversal of the Town ZBA's determination that a mikvah is not a neighborhood place of worship on state law grounds. In this litigation, plaintiffs seek both injunctive relief and damages, and their claims are primarily based on federal law. Thus, the state court cannot provide plaintiffs with all of the relief they seek here for their claims based on the mikvah.

Further, in evaluating whether <u>Colorado River</u> abstention is appropriate, federal district courts consider six factors:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

<u>Id.</u> at 100-01 (quoting <u>Woodford v. Cmty. Action Agency of Greene Cnty., Inc.</u>, 239 F.3d 517, 522 (2d Cir. 2001)). No one factor is determinative, and the balance is "heavily weighted in favor of the exercise of jurisdiction." <u>Id.</u> at 100-01 (quoting <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 16 (1983)). "Only the clearest of justifications will warrant dismissal." <u>Id.</u> at 101 (quoting <u>Colorado River</u>, 424 U.S. at 819). These six factors do not weigh against abstention here: (1) this controversy does not involve a res; (2) the two forums are located

24

within a geographically compact area; (3) dismissing the federal claims relating to the mikvah will do nothing to avoid piecemeal litigation, as both actions will continue after the issuance of this Opinion & Order regardless of whether the Court abstains from hearing the mikvah claim; (4) this action was filed three months before the state court action; (5) federal law provides the rules of decision for all of plaintiffs' claims that survive this decision; and (6) a determination in the Article 78 proceeding cannot fully compensate plaintiffs for past injuries as only "incidental" damages are available in an Article 78 proceeding.  Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000).

Accordingly, the Court declines to abstain from hearing plaintiffs' claims relating to the mikvah under Colorado River.

### 2.    Mootness and ripeness.

Defendants argue that plaintiffs' claims that are based on the allegations regarding the religious school should be dismissed on mootness and ripeness grounds.  In light of the issuance of the site plan approval for the religious school, and given that there are no allegations of further applications for approvals or permits, the Court agrees.

Pursuant to Article III of the Constitution, federal courts may only entertain actual cases or controversies.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A matter is an actual case or controversy only if the matter is not moot.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 189 (2000).  A matter is not moot if it is "real and live, not feigned, academic or conjectural." Russman v. Bd. of Educ., 260 F.3d 114, 118 (2d Cir. 2001); see also Powell v.

McCormack, 395 U.S. 486, 489 (1969).  A case is not moot, however, if there is a reasonable expectation that the alleged violation may recur, see Murphy v. Hunt, 455 U.S. 478, 482 (1982), or if the underlying dispute is "capable of repetition, yet evading review," Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 647 (2d Cir. 1998) (quoting Neb. Press Ass'n v. Stuart, 427 U.S. 539, 546 (1976)).

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005).  A claim is not ripe if it involves contingent future events that may or may not occur.  See Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 580-81 (1985).  The Supreme Court has also "developed specific ripeness requirements applicable to land use disputes."  Murphy, 402 F.3d at 347.  One of these requirements is that the government entity in question "has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 191 (1985).

"[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury."  Id. at 193.  The final-decision requirement applies to challenges to land use determinations based on the Constitution and RLUIPA.  See Sunrise Detox V, LLC v. City of White Plains, 769 F.3d 118, 122 (2d Cir. 2014).  It also applies to land use disputes arising under New York law.  Congregation

Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, 915 F. Supp. 2d 574, 598 (S.D.N.Y. 2013) (collecting cases).  Although the final-decision requirement should be applied cautiously in the First Amendment context, it must be applied nonetheless.  See Murphy, 402 F.3d at 350-51.

The final-decision requirement is not "mechanically applied," and a plaintiff in a land use case may be "excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile," such as when "a zoning agency . . . has dug in its heels and made clear that all such applications will be denied."  Id. at 349.  District courts "have found that in order to invoke the futility exception, a plaintiff must demonstrate: (1) the inevitability of refusal of their application, taking into consideration factors such as the defendants' hostility, delay and obstruction; and (2) that plaintiff has filed at least one meaningful application."  Quick Cash of Westchester Ave. LLC v. Village of Port Chester, No. 11–CV–5608 (CS), 2013 WL 135216, at *8 (S.D.N.Y. 2013) (quoting Osborne v. Fernandez, No. 06-CV-4127, 2009 WL 884697, at *5 (S.D.N.Y. Mar. 31, 2009)).  Futility does not exist merely because public officials are hostile to the proposal at issue.  See, e.g., S&R Dev. Estates, LLC v. Bass, 588 F. Supp. 2d 452, 463 (S.D.N.Y. 2008) (collecting cases); see also Quick Cash, 2013 WL 135216, at *8 ("[A]llegations of hostility or bad faith are insufficient to invoke the futility exception.").

Plaintiffs' claims with regard to the religious school must be dismissed on both mootness and ripeness grounds.  The site plan for the school was approved in

March 2015.  Thus, to the extent plaintiffs' claims concerning the religious school are based on defendants' delay in issuing site plan approval, these claims are no longer "real and live."  Russman, 260 F.3d at 118.  Further, the First Amended Complaint provides no basis on which this Court may infer that now that site plan approval has been given, it is reasonably likely to be revoked.  Plaintiffs' claims concerning the site plan approval for the religious school must be dismissed as moot.[14]

Further, to the extent plaintiffs' claims concerning the religious school are predicated on the Town's determinations as to the remaining steps in the process for completing the BJEC project, these claims are not ripe.  There is no allegation that plaintiffs have yet made any such applications, and the Town's approval of the site plan undercuts the argument that doing so would be futile.  The Town Defendants' past hostility to the BJEC is insufficient, standing alone, to justify invoking the futility exception here.  Accordingly, plaintiffs' claims concerning the religious school are dismissed.  This disposes of all claims by plaintiff the Bloomingburg Jewish Education Center.  Further, as the allegations against the

---

[14] It is unclear from the First Amended Complaint whether plaintiffs seek monetary damages in connection with their claims concerning the alleged delaying of the site plan approval for the religious school.  Insofar as they do, the First Amended Complaint does not contain any specific allegations that any plaintiff suffered financial injury as a result of the BJEC's inability to open to date.  The First Amended Complaint does allege that Rosenbaum and Stein will have to homeschool their children or send them to a Jewish school in another town (FAC ¶¶ 5, 122-23)—but it does not allege that doing either of these things will be more expensive than sending their children to the BJEC, nor can the Court properly infer that this is the case given the dearth of relevant allegations.  Rosenbaum's bare allegation that her need to homeschool her children has prevented her from obtaining a job (FAC ¶ 124) is likewise insufficient to support a claim for damages.  The Bloomingburg Jewish Education Center and Learning Tree similarly provide no detail as to the nature of the injury that they have suffered, beyond mere delay.  Accordingly, to the extent that plaintiffs seek monetary damages stemming from the delay in the site plan application for the religious school, these claims are independently subject to dismissal for failure to satisfy the pleading requirements of Twombly.

Village Planning Board,[15] the Town Board,[16] the Town Planning Board,[17] and Finnema, Heanelt, and Roe[18] solely concern the religious school, all claims against them are accordingly dismissed.[19]

   3.   Article III standing.[20]

Plaintiffs' claims that are based on the Village's alleged campaign of discriminatory code enforcement must be dismissed due to lack of Article III standing because no plaintiff has alleged that they have suffered an actual, particularized injury as a result of this campaign.  Further, plaintiffs lack standing to bring claims regarding the Village's consideration and pursuit of its own

---

[15] The allegations against the Village Planning Board only implicate the site plan application for the religious school.  (See, e.g., FAC ¶¶ 5, 104-08.)

[16] The Town Board is alleged only to have signed the IMA, which relates only to the claims concerning the religious school.  (See FAC ¶¶ 38, 113, 180, 202, 222, 246, 267, 301, 312.)

[17] The Town Planning Board is alleged to have (1) delayed the site plan application for the religious school (see, e.g., FAC ¶¶ 115, 179), and (2) to have approved the site plan for the mikvah (FAC ¶ 138), only to have this approval reversed on appeal by the Town ZBA (FAC ¶¶ 139-40).  However, since the Town Planning Board's decision as to the mikvah was favorable to plaintiffs, only the allegations concerning the religious school could support a claim against the Town Planning Board.

[18] Finnema, Heanelt, and Roe are alleged only to have been members of the Village Planning Board (see FAC ¶¶ 6, 34-36, 99-100, 105-06, 179, 200, 240, 298, 307), the allegations against which only implicate the site plan application for the religious school (see supra note 15).

[19] To the extent plaintiffs assert claims based on Town-imposed limits on plaintiffs' properties that are under consideration but have yet to be passed (see FAC ¶ 148), or based on the Village's consideration and pursuit of dissolving itself (see FAC ¶¶ 335, 341), these claims too are dismissed as unripe.

[20] The Court notes that defendants do not challenge the standing of any of the corporate plaintiffs to assert constitutional claims, and that Supreme Court and Second Circuit precedent suggest that corporations may assert claims under the First Amendment, the Equal Protection Clause, and the Due Process Clause of the Fourteenth Amendment.  See, e.g., Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2772-73 (2014) (suggesting that a corporation has standing to bring a claim under the Free Exercise Clause); Barrett v. United States, 689 F.2d 324, 333 (2d Cir. 1982) ("Corporations, because they are associations of individuals united for a special purpose, have long been viewed as persons for due process purposes." (internal quotation marks omitted)); Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702, 706-07 (2d Cir. 1982) (a corporation has standing to bring an equal protection claim based on discrimination against members of a protected class).

dissolution because plaintiffs do not allege that such dissolution is certainly impending.

Under Article III of the Constitution, federal courts may only exercise jurisdiction over actual cases or controversies.  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013).  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  Id. (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).  To establish Article III standing, a plaintiff must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  Id. at 1147 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)).  The Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact and that allegations of possible future injury are not sufficient."  Id. (alterations and internal quotation marks omitted) (emphasis in original).

Plaintiffs have brought several constitutional claims pursuant to § 1983 and § 1985 based on the Village's allegedly discriminatory application and enforcement of the New York State Building Code.  However, plaintiffs' vague allegations that the Village has discriminated against "[p]laintiffs' properties" (FAC ¶ 149), "Jewish-owned properties" (FAC ¶ 151), and "'Jewish' building in the Village" (FAC ¶ 152) are insufficient to support Article III standing because they are unconnected to any concrete, particularized alleged injury.  Plaintiffs similarly lack standing to bring claims based on the allegations regarding the pizza restaurant, as none of them

alleges an ownership interest in the pizza restaurant or the property on which it was located.

The only two plaintiffs who actually allege that they suffered particularized injuries as a result of acts of discriminatory building code enforcement are Learning Tree and Commercial Corner. Learning Tree alleges that the Village's August 28, 2014 stop-work order forced a well driller off the BJEC project site, which allegedly injured Learning Tree by further delaying the opening of the religious school. (FAC ¶¶ 155-56.) However, Learning Tree does not explain how this stop-work order has delayed the opening of the religious school beyond the length of time required to obtain the necessary approvals—and, as explained above, plaintiffs have not alleged that they have yet made all of the necessary applications. Accordingly, it is implausible that Learning Tree has suffered an injury in fact as a result of the August 28, 2014 stop-work order, and Learning Tree therefore lacks Article III standing to bring claims based on the Village's allegedly discriminatory enforcement of the New York State Building Code.

Commercial Corner likewise lacks Article III standing to bring such claims. Commercial Corner alleges that the Village has issued two stop-work orders to 79 Main Street, one of which has been stayed and the other of which is currently preventing people from entering the property. (FAC ¶¶ 157-58.) Commercial Corner also alleges that on August 20, 2014, a building code enforcement officer ordered a student prayer group to leave the premises. (FAC ¶ 160.) However, the First Amended Complaint provides absolutely no detail on the effects of the second

stop-work order on Commercial Corner.  Is Commercial Corner losing rental or business revenues as a result?  Has the opening of the hardware store that plans to open on Learning Tree's property been delayed?  Is Commercial Corner being prevented from making improvements to the property?  There are no such allegations.  Further, it is unclear from the First Amended Complaint how exactly Commercial Corner itself has been injured by its inability to host a student prayer group on its premises on a single occasion.  Because Commercial Corner has failed to set forth any particularized allegations of concrete hardships or damages flowing from the stop-work order or from when the student prayer group was forced off its property, it has thus failed to plead an injury in fact, and therefore lacks standing to bring claims based on acts of allegedly discriminatory building code enforcement.[21]

Accordingly, all of plaintiffs' claims against the Village that are predicated on the allegedly discriminatory enforcement of the New York State Building Code are dismissed in their entirety due to lack of standing.  Plaintiffs also lack standing under Article III to bring claims based on the Village's consideration of and steps toward dissolving itself.  The First Amended Complaint does not state that any such dissolution has occurred or certainly will occur, and as the Supreme Court has repeatedly and clearly stated, possible future injuries are insufficient to support Article III standing.  Clapper, 133 S. Ct. at 1147.

---

[21] On the same basis, Commercial Corner's claims must also be dismissed under Twombly due to lack of specificity.

4.    <u>Redundant state law claims.</u>

Plaintiffs' New York state law claims under §§ 3, 6, and 11 of the New York

Constitution as well as their request for an injunction on state law grounds against

the Moratorium must be dismissed as redundant.  The New York Constitution's due

process, equal protection, and free exercise protections are essentially coextensive

with those provided by the federal Constitution.  <u>See</u> <u>Town of Southold v. Town of</u>

<u>E. Hampton</u>, 477 F.3d 38, 52 n.3 (2d Cir. 2007) ("[T]he Equal Protection Clauses of

the federal and New York Constitutions are coextensive . . . ."); <u>Algarin v. N.Y.C.</u>

<u>Dep't of Corr.</u>, 460 F. Supp. 2d 469, 478 (S.D.N.Y. 2006) ("The New York State

Constitution's guarantee of due process is virtually coextensive with that of the U.S.

Constitution."); <u>In re Miller</u>, 684 N.Y.S.2d 368, 370-71 (N.Y. App. Div. 1998)

(analyzing free exercise claim under the New York Constitution based on federal

case law and noting that "[t]he Court of Appeals has not definitively stated whether

the scope of that provision is coextensive with the Free Exercise Clause of the First

Amendment of the U.S. Constitution").  There is no private right of action for

violations of the New York State Constitution where alternative remedies exist, for

example under § 1983.  <u>E.g.</u>, <u>Sherman v. Town of Chester</u>, No. 12 Civ. 647(ER),

2015 WL 1473430, at *14 (S.D.N.Y. Mar. 31, 2015); <u>Mahone v. City of New York</u>,

No. 13 Civ. 8014(PAE), 2014 WL 1407702, at *7 (S.D.N.Y. Apr. 10, 2014).

"[D]ismissal of state law claims is generally appropriate where 'state law provides

no theory for additional damages.'" <u>Mitarotonda v. Gazzola</u>, 172 F.3d 38, 38 (2d Cir.

1999) (summary order) (quoting <u>Segendorf-Teal v. Cnty. of Rensselaer</u>, 100 F.3d

270, 277 (2d Cir. 1996)).

Cause of Action Fourteen, which asserts claims under the New York Constitution, is based on the same factual allegations as and seeks the same relief as Causes of Action Eight, Nine, Ten, Eleven, Twelve, and Thirteen, which assert claims under the federal constitution, § 1983, and § 1985. (See ECF No. 121 at 7-8.) Accordingly, Cause of Action Fourteen must be dismissed.

Cause of Action Fifteen seeks an injunction against the enforcement of the Moratorium on the grounds that it is arbitrary and capricious under New York state law. This claim is based on the same allegations and seeks the same relief as plaintiffs' federal due process claims, under which arbitrary and capricious government conduct is unlawful. See Kurtz v. Verizon N.Y., Inc., 758 F.3d 506, 514 (2d Cir. 2014). Accordingly, Cause of Action Fifteen is dismissed as redundant.

Plaintiffs argue that the dismissal of their state law religious liberty claims at this stage would be premature, citing Fortress Bible Church v. Feiner, 734 F. Supp. 2d 409 (S.D.N.Y. 2010), Tartikov, 915 F. Supp. 2d 574, and People v. Kern, 75 N.Y.2d 638 (1990). As to Fortress Bible Church and Tartikov, the fact that district courts have in certain circumstances permitted both federal and state law claims to go forward does not imply that this Court must do so here. Further Kern is inapposite, as that case was a state court criminal case that did not involve federal constitutional claims for relief. Accordingly, plaintiffs' arguments against dismissal of their state law claims lack merit.

B.    § 1983 Claims

Plaintiffs Rosenbaum, Stein, Winterton Properties, and Sullivan Farms[22]
have brought several federal constitutional claims against defendants via § 1983.
Those which have not already been dismissed above concern the mikvah and
Chestnut Ridge.  As will be explained below, plaintiffs Rosenbaum, Winterton
Properties, and Sullivan Farms (but not Stein) have stated plausible First
Amendment, equal protection, and due process claims based on the mikvah
allegations, as well as plausible equal protection and due process claims based on
the Chestnut Ridge allegations.

"To state a claim under § 1983, a plaintiff must allege the violation of a right
secured by the Constitution and laws of the United States, and must show that the
alleged deprivation was committed by a person acting under color of state law."
West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).  Municipalities and other
local government units may be held liable under § 1983.  Monell v. Dep't of Social
Servs. of City of N.Y., 436 U.S. 658, 690 (1978).  To hold a municipality liable for a §
1983 claim, a plaintiff must ultimately prove that an official municipal policy or
custom caused the constitutional injury.  See Connick v. Thompson, 131 S. Ct. 1350,
1359 (2011).

To make out a colorable claim of municipal liability, a plaintiff must allege:
"(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a
denial of a constitutional right."  Wray v. City of New York, 490 F.3d 189, 195 (2d

---

[22] These are the plaintiffs whose claims have not been dismissed under the threshold analyses above.

Cir. 2007) (internal quotation marks and citation omitted).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Connick, 131 S. Ct. at 1359.

       1.     First Amendment.

All plaintiffs whose claims have not yet been dismissed—Rosenbaum, Stein, Winterton Properties, and Sullivan Farms—allege that defendants have violated their right to free exercise of religion and freedom of association under the First Amendment by thwarting the mikvah project and delaying the development of Chestnut Ridge.  Plaintiffs Winterton Properties and Rosenbaum have stated a cognizable First Amendment claim against the Town, the Town ZBA, and Herrmann as to the mikvah, which is a facility that is clearly used for ritual practices.  Plaintiffs have not stated a cognizable First Amendment claim as to Chestnut Ridge, which bears only a tenuous tie to any particular plaintiff's own religious worship and observance.

The First Amendment prohibits government actions that "substantially burden the exercise of sincerely held religious beliefs" unless those actions "are narrowly tailored to advance a compelling government interest."  Fortress Bible Church v. Feiner, 694 F.3d 208, 220 (2d Cir. 2012) (quoting Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002)).  When a plaintiff claims their rights under the Free Exercise Clause have been violated, they must demonstrate that the official conduct at issue operated coercively against them "in the practice of [their] religion."  Harris v. McRae, 448 U.S. 297, 321 (1980) (quoting

Abington Sch. Dist. v. Schempp, 374 U.S. 203, 223 (1963)).  A law or regulation that is neutral and of general applicability is constitutional even if it has an incidental effect on religion.  See Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 878 (1990).  However, "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534 (1993).

The First Amendment right to freedom of association protects a person's right to enter into "intimate human relationships" as well as associations for the purpose of exercising other First Amendment liberties including "speech, assembly, petition for the redress of grievances, and the exercise of religion."  Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).

Plaintiffs Winterton Properties and Rosenbaum have stated a First Amendment claim against the Town, the Town ZBA, and Herrmann under the First Amendment.  According to plaintiffs, the stymying of the mikvah project started with the Town's issuance of a stop-work order to Winterton Properties following a personal inspection of the mikvah property by Herrmann, which in turn occurred around the time Herrmann took office as Town Supervisor in January 2014.  Plaintiffs allege that Herrmann's and the Town's actions with regard to the mikvah stem from improper, discriminatory motives on Herrmann's part, as shown by his role in founding the allegedly anti-Hasidic RCC, his campaign slogan "stop 400 from turning into 4000," his appointment of opponents of the Hasidic community to town

37

boards, and his alleged public comments regarding his desire to keep Jews from moving into the Town.  Plaintiffs further allege that the Town ZBA, whose chair was appointed by Herrmann, overturned the Town Planning Board's approval of the site plan for the property without providing a reasoned basis for its conclusion or explaining why a mikvah is not a neighborhood place of worship.

Given this sequence of events, at this stage in the litigation, plaintiffs are entitled to the reasonable inference that the stop-work order and the Town ZBA's determination were designed to coercively prevent Hasidic Jewish residents of Bloomingburg such as Rosenbaum and property owners affiliated with the Hasidic Jewish community such as Winterton Properties from exercising their religion and associating with others to do the same.  Further, according to plaintiffs' allegations the Town's actions with respect to the mikvah did not advance any legitimate government interest.  Therefore, plaintiffs Winterton Properties and Rosenbaum have stated valid free exercise and freedom of association claims against the Town, the Town ZBA, and Herrmann.

However, plaintiffs' allegations regarding Chestnut Ridge are only tenuously tied to actual religious practices by plaintiffs, and are accordingly insufficient to support plausible claims for relief under the First Amendment.  The only way in which plaintiffs connect the Chestnut Ridge housing developing with the practice of religion is through the First Amended Complaint's allegation that the Moratorium has prevented the construction of housing units with kosher kitchens and "all of the necessary religious requirements."  (FAC ¶¶ 87, 279-80.)  But the only two plaintiffs

who could theoretically have standing to bring such a claim are Rosenbaum and Stein. Yet the First Amended Complaint does not allege that Rosenbaum and Stein have been prevented from obtaining housing with kosher kitchens, nor does it allege that any individual in Bloomingburg has been prevented from converting an existing kitchen to a kosher kitchen, or whether a permit or license is required to do so and, if so, whether any such applications have been made. Nor do Rosenbaum and Stein allege that the lack of kosher kitchens has hindered their ability to observe kosher dietary laws while living in Bloomingburg. Nor do plaintiffs specify what the other "necessary religious requirements" are. Plaintiffs' allegations regarding Chestnut Ridge are simply too tenuously connected with actual religious practice to support a plausible First Amendment Claim.

        2.    <u>Equal Protection Clause.</u>

All plaintiffs whose claims have not yet been dismissed—Rosenbaum, Stein, Winterton Properties, and Sullivan Farms—allege that the Town Defendants' actions to prevent the development of a mikvah and the Village Defendants' enactment of the Moratorium and failure to issue certificates of occupancy for units at Chestnut Ridge have violated their rights under the Equal Protection Clause, which prohibits state actors from discriminating on the basis of religion. <u>Knight v. Conn. Dep't of Public Health</u>, 275 F.3d 156, 166 (2d Cir. 2001). The Court agrees that plaintiffs have stated valid equal protection claims. Specifically, Rosenbaum and Winterton Properties have stated a valid equal protection claim against the Town, the Town ZBA, and Herrmann, and Sullivan Farms has stated a valid equal protection claim against the Village, the Village Board of Trustees, Gerardi,

39

Johnson, and Roemer, but not against Rogers.  The allegations regarding plaintiff Stein are insufficient to support an equal protection claim.

There are several ways for a plaintiff to plead intentional religious discrimination that violates the Equal Protection Clause: (1) a plaintiff could point to a law or policy that expressly classifies persons on the basis of religion; (2) a plaintiff could allege that a facially neutral law or policy has been applied in an intentionally discriminatory manner; or (3) a plaintiff could allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.  See Brown v. City of Oneonta, N.Y., 221 F.3d 329, 337 (2d Cir. 1999).  Discriminatory intent may be evidenced by such factors as disproportionate impact, the historical background of the challenged decision, antecedent events, departures from normal procedures, and contemporary statements by decisionmakers.  Vill. of Arlington Heights v. Metro Housing Dev. Corp., 429 U.S. 252, 266-68 (1977).  "A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals."  Pyke v. Cuomo, 258 F.3d 107, 108-09 (2d Cir. 2001).

Plaintiffs Rosenbaum and Winterton Properties have stated a plausible equal protection claim against the Town, the Town ZBA, and Herrmann based on the allegations pertaining to the mikvah.  Essentially, Rosenbaum and Winterton Properties argue that the stop-work order issued to Winterton Properties and the

Town ZBA's determination that the mikvah is not a neighborhood place of worship constitute applications of otherwise facially neutral policies that were designed to intentionally discriminate against Winterton Properties because it is affiliated with the Hasidic Jewish community.  Plaintiffs' allegations of discriminatory motivation and intent are sufficient to support such a claim.  As explained above in the discussion of Rosenbaum's and Winterton Properties' First Amendment claims, Town Supervisor Herrmann is alleged to have founded the anti-Hasidic RCC and to have publicly opposed Hasidic Jews' moving into the Town, and the stymying of the mikvah project is alleged to have started shortly after Herrmann took office as Town Supervisor.  Further, the Town ZBA is alleged to have provided no reasoned basis for its conclusion that a mikvah is not a neighborhood place of worship.  These allegations are sufficient to support an equal protection claim by Rosenbaum and Winterton Properties against the Town, the Town ZBA, and Herrmann.

As to Chestnut Ridge, plaintiff Sullivan Farms has stated a plausible equal protection claim against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer, but not against Rogers.  Sullivan Farms alleges that the Moratorium, which is a facially neutral statute or policy, has had an adverse effect on the Chestnut Ridge project (which is responsible for most, if not all, current building activities in the Village), and that the Village has failed to issue certificates of occupancy for the 51 completed townhome units at Chestnut Ridge, notwithstanding whatever assumedly facially neutral policy the Village has in place for the issuance of certificates of occupancy.

Further, plaintiffs have provided detailed and legally sufficient allegations that lead to the reasonable inference that in taking these actions, the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer were motivated by discriminatory animus and intentionally acted to discriminate against Hasidic Jews. For instance, Mayor Gerardi, who voted for the Moratorium, is alleged to have campaigned for office on a platform that openly opposed Hasidic Jews moving into Bloomingburg; to have received political support from the RCC, an allegedly anti-Hasidic organization; and to have referred to Jewish people as "those things." (FAC ¶ 157.) Johnson and Roemer, who also voted for the Moratorium, were elected on what are alleged to have been anti-Hasidic platforms and with RCC support, and Johnson has allegedly made several derogatory remarks about Hasidic women. Further, the Moratorium was passed only a week after the injunction was struck down by the Appellate Division of the New York Supreme Court, and several months after a rising tide of anti-Hasidic sentiment in the Village led to the election of several individuals who had run on openly anti-Hasidic platforms. The allegations in the First Amended Complaint can therefore support Sullivan Farms' equal protection claim based on the Chestnut Ridge allegations.

However, Sullivan Farms has failed to state an equal protection claim against Rogers. Rogers did not vote for the Moratorium and is not alleged to have been involved in the Village's failure to issue certificates of occupancy to Sullivan Farms. Rather, Rogers is alleged only to work with Gerardi and a Village code enforcement officer to enforce the Moratorium. (FAC ¶ 365.) The First Amended

Complaint provides no detail as to what actions Roger has taken in this regard. This bare, vague allegation is insufficient to support an equal protection claim against Rogers.

As to plaintiff Stein, she alleges only that she resides in Bloomingburg (FAC ¶ 26), she desires to send her children to the BJEC (FAC ¶ 26), and that she currently sends her children to schools in Kiryas Joel, another nearby town (FAC ¶ 123). As Stein does not allege any connection to the mikvah allegations or the Chestnut Ridge allegations, her equal protection claim must be dismissed.

In sum, Rosenbaum and Winterton Properties have stated a valid equal protection claim against the Town, the Town ZBA, and Herrmann, and Sullivan Farms has stated a valid equal protection claim against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer. The allegations as to Stein are insufficient under Twombly to support any equal protection claim by her.

3.   Due Process Clause.

Plaintiffs argue that the Village's enactment of the Moratorium was arbitrary and therefore violated their federal due process rights.[23]  The only plaintiff with standing to bring such a claim is Sullivan Farms, which has stated a cognizable due process claim against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.

To state a claim under the Due Process Clause a party must allege that "(a) there has been a deprivation of liberty or property in the constitutional sense; and

---

[23] Plaintiffs do not assert any federal due process claims against the Town Defendants.  (See FAC ¶¶ 317-331; ECF No. 121.)

(b) the procedures used by the state to effect this deprivation were constitutionally inadequate." <u>Rivera v. Marcus</u>, 696 F.2d 1016, 1022 (2d Cir. 1982) (citations omitted). "Substantive due process requires only that economic legislation be supported by a legitimate legislative purpose furthered by a rational means." <u>In re Chateaugay Corp.</u>, 53 F.3d 478, 486–87 (2d Cir. 1995) (internal quotation marks omitted). Legislation that does not infringe fundamental rights or target suspect classifications enjoys a "strong presumption of rationality." <u>Beatie v. City of N.Y.</u>, 123 F.3d 707, 712 (2d Cir. 1997). "Thus to survive a Rule 12(b)(6) motion, a substantive due process claim must allege that the 'legislature has acted in an arbitrary and irrational way.'" <u>Alliance of Auto Mfrs., Inc. v. Currey</u>, No. 13–4890–cv, 2015 WL 1529018, at *3 (2d Cir. Apr. 7, 2015) (quoting <u>Pension Benefit Guar. Corp. v. R.A. Gray & Co.</u>, 467 U.S. 717, 729 (1984)).

Plaintiffs' allegations are sufficient to state a claim under the Due Process Clause by Sullivan Farms against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.[24] Sullivan Farms has adequately alleged that it suffered has been deprived of a property interest via the diminution in the value of its investment in Chestnut Ridge that has been caused by the financial injury due to the delays in closing sales on the completed townhomes. Further, Sullivan Farms has alleged that the Village's actions with regard to Chestnut Ridge have been arbitrary and designed to target current and prospective Hasidic Jewish residents of Bloomingburg, for whom Chestnut Ridge would be an especially

---

[24] Sullivan Farms' federal due process claim against Rogers must be dismissed for the same reason that the federal equal protection claim against her was dismissed, namely, that the First Amended Complaint provides no detail as to what actions Roger has taken to enforce the Moratorium.

attractive place to live.  Specifically, the First Amended Complaint alleges that the Moratorium was enacted by the Village Board of Trustees, which at the time was comprised of Gerardi, Johnson, and Roemer, for the sole purpose of hindering the Chestnut Ridge project, and that its purported justification—the investigation of a "substantial number of complaints" (Cross Decl. ex. C)—had no basis in fact, as demonstrated by the Village's reliance on post-Moratorium complaints when pressed in subsequent litigation.  Accordingly, Sullivan Farms has stated a plausible due process claim against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.

> C.      § 1985 Claim

Those plaintiffs who have not yet been dismissed from this action have also stated plausible claims against those defendants who have not yet been dismissed under 42 U.S.C. § 1985, which authorizes actions based on conspiracies to interfere with federal civil rights.  "To state a claim under 42 U.S.C. § 1985, a plaintiff must allege: (1) a conspiracy, (2) an intent or purpose to deprive a person of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to a person, including injury to property, person, or constitutional right."  Bhatia v. Yale Sch. of Med., 347 Fed. App'x 663, 664 (2d Cir. 2009) (summary order).  The conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action."  Robinson v. Allstate Ins. Co., 508 Fed. App'x 7, 9 (2d Cir. 2013) (summary order) (quoting Britt v. Garcia, 457 F.3d 264, 270 n.4 (2d Cir. 2006)).  The complaint must also "provide some factual basis supporting a meeting of the minds, such that defendants entered

into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).

Plaintiffs' allegations are sufficient to state a plausible § 1985 claim.  Indeed, the picture painted by the First Amended Complaint is one of a concerted scheme actually carried out by political allies (such as Herrmann, Gerardi, Johnson, and Roemer, who are all alleged to be involved with or supported by the RCC) and the Town and Village government entities under their control to engage in a pervasive and wide-ranging scheme to keep Hasidic Jews out of Bloomingburg.  And as explained above in the discussion of plaintiffs' equal protection claims, plaintiffs allege that they were deprived of equal protection of the law through defendants' enactment of the Moratorium and failure to issue certificates of occupancy for the completed townhomes at Chestnut Ridge, actions which are alleged to have been intentionally discriminatory or motivated by discriminatory animus and to have had an adverse effect on plaintiffs' properties.  Accordingly, plaintiffs Rosenbaum, Sullivan Farms, and Winterton Properties have alleged plausible § 1985 claims against defendants the Town, the Town ZBA, Herrmann, the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.

D.    Fair Housing Act Claim

Plaintiffs Sullivan Farms, Rosenbaum, and Stein have brought claims under the FHA, which protects buyers and renters of housing from discrimination.  Because Rosenbaum and Stein already live in Bloomingburg and there are no allegations that they seek to live in Chestnut Ridge or that real estate sellers or landlords discriminated against them, they lack standing to sue under the FHA.

Sullivan Farms, on the other hand, does have standing to sue under the FHA, and it has stated a cognizable FHA claim against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.

The FHA prohibits discrimination in the housing market based on religion. United States v. Space Hunters, Inc., 429 F.3d 416, 419 (2d Cir. 2005). "An FHA violation may be established on a theory of disparate impact or one of disparate treatment." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995). In a case involving a challenge to actions taken by a municipality, "[u]nder the latter theory, a plaintiff can establish a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." Id. (internal quotation marks omitted); see also Smith v. NYCHA, 410 Fed. App'x 404, 406 (2d Cir. 2011) (summary order) (same). "If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons." LeBlanc Sternberg, 67 F.3d at 425. Discriminatory intent may be inferred from the totality of the circumstances. Id.

"The FHA confers standing to challenge . . . discriminatory practices on . . . any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." Id. at 424 (quoting 42 U.S.C. § 3602(i)). "[A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is

permitted to prove that the rights of another were infringed." Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 103 n.9 (1979); see also Andujar v. Hewitt, No. 02 CIV. 2223(SAS), 2002 WL 1792065, at *8 n.7 (S.D.N.Y. Aug. 2, 2002) (under the FHA, "membership in a protected class is not required as a prerequisite to sue"). Thus, to have standing under the FHA, a private plaintiff need only allege "injury in fact within the meaning of Article III of the Constitution, that is, . . . distinct and palpable injuries that are fairly traceable to [defendants'] actions." LeBlanc Sternberg, 67 F.3d at 424 (alteration in original) (internal quotation marks omitted). "Under this lenient standard, courts have granted standing to, among others, developers asserting challenges under the FHA against municipal decisions that present a barrier to developments." Anderson Grp., LLC v. City of Saratoga Springs, No. 1:05–cv–1369 (GLS\DRH), 2011 WL 2472996, at *2 (N.D.N.Y. 2011) (collecting cases from the Second Circuit, this District, and the Northern District of New York); see also El Dorado Estates v. City of Fillmore, 765 F.3d 1118, 1122 (9th Cir. 2014) (mobile park home owner had standing to bring FHA claim on behalf of future residents of subdivision because "[t]he right not to have to endure housing discrimination, even if one is not among the class of persons discriminated against, is a constitutionally cognizable legal interest supporting standing"). "An injury need not be economic or tangible in order to confer standing" under the FHA. LeBlanc Sternberg, 67 F.3d at 425.

In Causes of Action Six and Seven, Sullivan Farms, Rosenbaum, and Stein assert FHA claims based on the allegations relating to Chestnut Ridge. Rosenbaum

and Stein, however, already reside in Bloomingburg, and there are no allegations in the First Amended Complaint tying them to housing discrimination—Rosenbaum alleges only that she has been personally subjected to acts of discrimination in Bloomingburg, and Stein does not make any allegations concerning discrimination or housing at all.  Rosenbaum's and Stein's FHA claims must accordingly be dismissed.

Sullivan Farms, on the other hand, has adequately alleged a cognizable injury—specifically, its inability to economically benefit from its commercial real estate development, Chestnut Ridge.  Defendants argue that Sullivan Farms has not alleged a cognizable injury under the FHA because it has already completed a significant number of units and because once the Moratorium expires Sullivan Farms can complete many more.  This argument ignores the fact that Sullivan Farms is not building Chestnut Ridge for the sheer sake of building, but rather to profit from it as a commercial venture, and it fails to address Sullivan Farms' allegations that it has been deprived of the ability to economically benefit from the Chestnut Ridge project due to being unable to close on sales of its 51 completed townhomes, which is in turn due to the Village's failure to respond to its requests for certificates of occupancy, as well as the delays caused by its still-pending building permit applications.  (See FAC ¶¶ 48, 63-64, 86-87, 335; Tr. 43:5-8; see also Tr. 15:18-20.)  Sullivan Farms has thus alleged an economic injury that is "distinct and palpable" and "fairly traceable" to defendants' alleged discriminatory conduct, LeBlanc-Sternberg, 67 F.3d at 424, and therefore has alleged injury in fact under

Article III of the Constitution.  And because—as explained above—the First Amended Complaint adequately alleges that the Village's enactment of the Moratorium and its failure to issue certificates of occupancy for Chestnut Ridge were motivated by discriminatory animus against Hasidic Jews, Sullivan Farms has stated a plausible and cognizable claim under the FHA.

In sum, Rosenbaum's and Stein's FHA claims must be dismissed, and Sullivan Farms' FHA claim shall proceed against the Village, the Village Board of Trustees, Gerardi, Johnson, and Roemer.[25]

E.   Immunity

Having now determined that plaintiffs have stated plausible claims against Gerardi, Herrmann, Johnson, and Roemer, the Court must address whether any of these individual defendants are immune from suit.  Each of these individual defendants argues that the Court should find they are immune from suit because the allegations against them only concern legislative acts and general policymaking. Herrmann also argues that he is not alleged to have violated a clearly established federal right, and therefore the claims against him should be dismissed under the doctrine of qualified immunity.

"Immunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities." Almonte v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007) (quoting Morris v. Lindau, 196 F.3d 102, 111 (2d Cir. 1999)); see also State Emps. Bargaining Agent Coal. v.

---

[25] Sullivan Farms' FHA claim against Rogers must be dismissed for the same reason that the federal equal protection and due process claims against Rogers have been dismissed.

Rowland, 494 F.3d 71, 86 (2d Cir. 2007) (immunity is not a defense to "official-capacity claims against local-level officials").  The Court concludes that Gerardi, Johnson, and Roemer have legislative immunity against individual-capacity claims based on their votes for the Moratorium, and Herrmann is entitled to qualified immunity because the only live allegation against him concerns a singular act of trespass on the mikvah property, which standing alone cannot support an argument that he violated a clearly established federal right.

       1.     Legislative immunity.

    All of the individual defendants argue that they are entitled to absolute legislative immunity.  Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity."  Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951)).  Legislative immunity applies to actions that are both "(1) substantively legislative, i.e., acts that involve policy making," and "(2) procedurally legislative, i.e., passed by means of established legislative procedures."  State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 89 (2d Cir. 2007) (quoting State Emps. Bargaining Agent Coal. v. Rowland, No. Civ. 303CV221 AVC, 2006 WL 141645, at *3 (D. Conn. 2006)).

    Legislative immunity does not apply to administrative acts or the enforcement of existing laws, ordinances, or regulations.  See, e.g., id. at 83-84 (legislative immunity does not apply to enforcement activities); Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003) (public officials not entitled to legislative immunity that were "administrative, not legislative, in nature" in that they did not implicate "the kind of broad, prospective policymaking that is

characteristic of legislative action"); <u>Jessen v. Town of Eastchester</u>, 114 F.3d 7, 8 (2d Cir. 1997) (per curiam) (challenged determination "was an administrative act that legislative immunity does not protect").  A municipal action may be administrative in nature even if is subject to a vote by public officials.  <u>See</u> <u>Harhay</u>, 323 F.3d at 211.[26]

Gerardi, Johnson, Roemer, and Herrmann argue that all claims against them in their individual capacities are barred based on legislative immunity.  Gerardi, Roemer, and Johnson are indeed entitled to legislative immunity as to claims against them in their individual capacity predicated on their votes for the Moratorium, which they cast as members of the Village Board of Trustees.  The passage of the Moratorium was undoubtedly a legislative act, and not an administrative one, in that it both involved the making of policy regarding building and construction in the Village, and it was passed by means of the Village's established legislative procedures.  In sum, Gerardi, Johnson, and Roemer have legislative immunity against individual-capacity claims based on the Chestnut Ridge allegations.[27]

Because plaintiffs' claims concerning the religious school have been dismissed on ripeness and mootness grounds, the Court need not reach the issue of whether

---

[26] Plaintiffs argue that "common law immunity for state government officials does not extend to federal civil rights claims," citing as support <u>Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead</u>, 98 F. Supp. 2d 347, 356 (S.D.N.Y. 2000).  (ECF No. 74 at 23.)  This assertion confuses language in that opinion regarding New York's common law immunity principles with the "very different guidelines that govern immunity under federal civil rights claims."  <u>Yeshiva Chofetz</u>, 98 F. Supp. 2d at 356.

[27] Gerardi, Johnson, and Roemer are not alleged to have been personally involved in the Village's failure to issue certificates of occupancy for the completed townhomes at Chestnut Ridge.

Gerardi, Herrmann, Johnson, and Roemer are entitled to legislative immunity for claims against them in their individual capacity that are predicated on actions relating to the IMA.  Likewise the Court need not reach the issue of whether Finnema, Heanelt, and Roe are entitled to legislative immunity for claims based on their denial of the school's site plan application.

    2. <u>Qualified immunity.</u>

   Herrmann argues that the claims against him should be dismissed under the doctrine of qualified immunity because plaintiffs have failed to allege that he violated a clearly established federal right.  Herrmann is correct.

   "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  <u>Id.</u> at 243 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999)) (internal quotation marks omitted).  The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  <u>Id.</u> at 231.

In order for the doctrine of qualified immunity to serve its purpose, the availability of qualified immunity should be decided "at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991).  "[D]efendant bears the burden of pleading and proving the affirmative defense of qualified immunity."  Blissett v. Coughlin, 66 F.3d 531, 539 (2d Cir. 1995).  When a defendant raises a qualified immunity defense on a motion to dismiss, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004).

Herrmann is entitled to qualified immunity with respect to those claims against him that remain live.  Herrmann is alleged to have co-founded the RCC and to have campaigned for office on an anti-Hasidic platform—which suggests that he was motivated to engage in unconstitutional religious discrimination—and he is alleged to have been a ringleader in a conspiracy to keep Hasidic Jews out of Bloomingburg.  However, in terms of actual actions taken by Herrmann, the First Amended Complaint alleges only that he: (1) signed the IMA on behalf of the Town Board (FAC ¶¶ 114, 180, 202, 222, 246, 267, 299, 301, 308, 310, 312); (2) trespassed on the property on which plaintiffs seek to build a mikvah in January 2014 in order to facilitate the issuance of a discriminatory stop-work order (FAC ¶ 136); and (3) appointed anti-Hasidic individuals to various town boards (FAC ¶ 147).  But plaintiffs' claims regarding the IMA have already been dismissed on ripeness and mootness grounds, and while Herrmann's alleged act of trespass could be relevant

to a federal constitutional claim, one cannot say that by a singular act of crossing a property line he could have violated any clearly established federal right.  As to the appointments to the town boards, it is not possible for a public official to violate the Constitution or a federal statute by virtue of appointing a public official who expressed a particular view as to a particular political or social issue—even if the view expressed is widely regarded to be abhorrent.  Thus, Herrmann is not alleged to have violated a clearly established federal right, and he is therefore entitled to qualified immunity from suit.  The live claims against him in his individual capacity (but not those against him in his official capacity) must accordingly be dismissed.[28] Those official capacity claims against Herrmann that remain shall proceed.

V.      CONCLUSION

        For the foregoing reasons, defendants' motions to dismiss are GRANTED IN PART AND DENIED IN PART.  Plaintiffs Rosenbaum and Winterton Properties have stated plausible claims for relief based on the mikvah allegations under § 1983 (via the First Amendment and the Equal Protection Clause) and § 1985 against the Town, the Town ZBA, and Herrmann in his official capacity.  Plaintiff Sullivan Farms has stated plausible claims for relief based on the Chestnut Ridge allegations under § 1983 (via the Equal Protection Clause and the Due Process Clause of the

---

[28] Plaintiffs argue that it would be too early at this stage to dismiss Herrmann on immunity grounds, because the determination of whether he is entitled to qualified immunity is a fact-specific inquiry. Plaintiffs are correct that as a general matter resolving the issue of qualified immunity at the motion to dismiss stage, "when the facts are not clear, would be inappropriate."  Young v. State of N.Y. Office of Mental Retardation and Dev. Disabilities, 649 F. Supp. 2d 282, 292 & n.63 (S.D.N.Y. 2009) (collecting cases).  But here the dearth of factual allegations concerning potentially unlawful actions taken by Herrmann, who as the Town Supervisor is a particularly high-profile individual in his community and whose actions one would expect to be particularly conspicuous, if there were any, counsel toward dismissing Herrmann at this early stage of the litigation.

Fourteenth Amendment), § 1985, and the FHA against the Village, the Village Board of Trustees, Gerardi in his official capacity, Johnson in his official capacity, and Roemer in her official capacity. All of plaintiffs' other claims are dismissed. The following parties have been fully dismissed from this action: plaintiffs the Bloomingburg Jewish Education Center, Commercial Corner, Learning Tree, and Stein; and defendants the Village Planning Board, the Town Board, the Town Planning Board, Rogers, Finnema, Heanelt, and Roe. Gerardi, Johnson, and Roemer have legislative immunity against all live individual-capacity claims against them based on their votes for the Moratorium, and Herrmann is entitled to qualified immunity.

Plaintiffs shall **within 14 days** file a Second Amended Complaint, which shall remove those parties and claims that have been dismissed and eliminate all redundancy. Plaintiffs shall not add any new allegations. Defendants shall then answer **within 14 days** of the filing of the Second Amended Complaint. No additional motions to dismiss shall be permitted.

The Clerk of Court is directed to close the motions at ECF Nos. 67 and 71.

SO ORDERED.

Dated:     New York, New York
            June 9, 2015


                              KATHERINE B. FORREST
                          United States District Judge