The Law Offices of
## DAVID CLIFFORD HOLLAND
A Professional Corporation
Member of New York, New Jersey, and Maryland Bars

July 15, 2016

The Hon. Katherine B. Forrest
USDJ - SDNY
500 Pearl Street
New York, New York 10007

Re: Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg 14-CV-7250 (KBF)

Dear Judge Forrest:

      I am former counsel to the Defendants in the previously dismissed RICO action.  I submit this letter in response to Plaintiffs' motion to compel production of privileged documents in the custody and control of my paralegal, Jonathan Hyman.  As demonstrated by the exhibits discussed below and tendered separately in hard copy form for *in camera* review, there can be little doubt that Mr. Hyman was at all times a *bona fide* paralegal working under my control and in accordance with Rule 5.3 of New York's Rules of Professional Conduct.[1]  The motion should be dismissed out of hand, not only because it is harassing and an unmitigated piscatorial expedition into privileged waters, but also because it is predicated upon conjecture, conspiracy theory, fabrication, and fantasy.  Efforts to resolve this matter through a sample privilege log were unsuccessful. *See, Exhibit 29, Electronic Exhibit 1 (unsanitized partial log), Electronic Exhibit 2 (sample log)*. Given the motion, further discussions about producing a more detailed privilege log is moot.

      Courts are to be "keenly aware of the necessity for paralegals with specialized skills in today's legal arena and [should] not seek to substitute its own judgment to broadly reclassify certain types of activities" performed by them. *In re Bennett Funding Group, Inc., 213 B.R. 234, 248, 1997 Bankr. LEXIS 1562, *36 (Bankr. N.D.N.Y. 1997)*.  The use of paralegals is encouraged to keep the "spiraling costs" of litigation down by allowing them under supervision to locate and interview witnesses or compile data among several other functions. *W. Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 106, 111 S. Ct. 1138, 1151, 113 L. Ed. 2d 68 (1991)*. According to the Bureau of Labor Statistics, among the many duties that are typical for a paralegal to perform are: (1) investigate and gather facts; (2) research relevant law and legal articles; (3) organize and maintain documents; (4) gather and arrange evidence and other legal documents; (5) write or summarize reports to help attorney prepare for trial; (6) get affidavits that may be used as evidence; (6) Call clients, witnesses, lawyers, and outside vendors to schedule interviews, meetings, and depositions. *See Occupational Outlook Handbook: Paralegals and Legal Assistants--What Paralegals and Legal Assistants Do, BUREAU LAB. STAT. (Jan. 8, 2014) [hereinafter What Paralegals and Legal Assistants Do]*,http://www.bls.gov/ooh/Legal/

---

[1] The law firms that represent the municipalities will not waive attorney-client or attorney work product privilege over any communications that are the subject of the instant motion. That constrains me from making the exhibits public and must then be hand delivered to the Court for *in camera* review. All such Exhibits submitted *in camera* are referred to herein by number.

*Paralegals-and-legal-assistants.htm#tab-2*. As discussed below, Mr. Hyman performed all of those paralegal tasks recognized by the Bureau of Statistics. Mr. Hyman was hired by me because of our prior social and working relationship. *See, Exhibit 27*. It was also to keep costs down. Jonathan was hired to research cases and cultivate information for potential claims as either counterclaims in the BJEC action or as independent actions. *See, Exhibit 1; Exhibit 2; Exhibit 3*. Once I was retained, I explicitly described some of the tasks with which Hyman would be assigned. *See, Exhibit 4, ¶ 5; Exhibit 6C*. Thereafter, Jonathan, Phil Simpson, Esq., and I poured over vast amounts of information amassed in anticipation of litigation. *See, Exhibit 5; Exhibit 6B; Exhibit 7; Exhibit 10; Exhibit 18; Exhibit 19; Exhibit 19A; Exhibit 23*. When Simpson needed case research and fact development, he would appoint specific tasks to Jonathan reviewing and retrieving public records. *See, Exhibit 8; Exhibit 8A; Exhibit 11; Exhibit 21*. Similarly, Jonathan assisted me with obtaining records. *See, Exhibit 13*. He contacted and coordinated third party providers regarding Defendant Berentsen. *See, Exhibit 24*. The volume of materials that Mr. Hyman, Mr. Simpson and I reviewed in print and electronic form was formidable. *See, Exhibit 26*. At all times Jonathan was acting under my direction or that of my co-counsel and looked to of Mr. Simpson for guidance and instruction in my absence. *See, Exhibit 22*. His duties and responsibilities fall squarely under the Bureau of Statistics definitions of a paralegal.

   To argue that somehow Mr. Hyman was the puppet master of the Town Board, the RICO case and PR campaign is just non-sensical. By confidential request *(Exhibit 6)*, Simpson, Hyman, and I each made inquiries to public relations firms to assist the legal team with conveying the ideas and complexities of the case to the Town Board and the public at large. *See, Exhibit 6A*. Mr. Simpson received a proposal from a PR Firm he contacted. *See, Exhibit 9*. A meeting was arranged by Mr. Hyman with West End Strategy which was later retained. It was not Hyman's choice to hire West End as he was not the client. Because of the onerous and time consuming nature of the complaint drafting, Jonathan, familiar with the RICO claims, and a published author, was directed to work with and be the point person for West End Strategy freeing up Mr. Simpson and me to continue our drafting. Mr. Hyman educated West End with documentation pertinent to some of the claims and issues of the case *(See, Exhibit 12; Exhibit 20)*. At no time during his work with West End was he acting independent of me or Mr. Simpson. In fact, Jonathan was reluctant to have a phone conference with them without my participation. *See, Exhibit 14*. To say that Mr. Hyman terminated the relationship with West End is preposterous. The contract expired and there was no need to extend or renew. *See, Exhibit 25*.

   Equally preposterous is Plaintiffs contention that Hyman was the mastermind behind the Town's decision to bring the RICO case and guide them during the course of the litigation. I would discuss questions and issues with the client directly by phone or email and when I was unable, I would give instruction to Jonathan to convey to the client. *See, Exhibit 15; Exhibit 15A; Exhibit 15B; See also, Exhibit 16 conveying precise instruction*. My retainer identified that I would hire a paralegal. Likewise, the Common Interest Agreement entered into by all counsel for the municipalities asserted privilege over all communications with clients, counsel, and paralegals. *See, Exhibit 17*. While I did specifically name Mr. Hyman as my paralegal in privileged communications, and described specific duties with which he would be tasked *(Exhibit 4)*, I did not do so in discoverable documents specifically to protect him from a campaign of harassment to which he is exposed to by this motion. While I paid Mr. Hyman for his services *(Exhibit 28)*, no amount of money makes up for the libelous slurs and aspersions that Plaintiffs tarnished him with to bait this court into granting their baseless motion.

The Court should deny the motion because Plaintiffs' fail to meet their initial burden of demonstrating a "highly persuasive showing" of "substantial need" for the privileged information they seek. *In re Grand Jury Proceedings, 219 F.3d 175, 190-91 (2nd Cir. 2000); US v. Adlman, 68 F.3d 1495, 1501 (2d Cir. 1995)*. To the extent that the Court wishes to probe the issues, it faces the two step task of determining whether communications had with Hyman, or to which he was privy, qualify as attorney client communications, and if so, whether an exception or waiver has vitiated it. *Martin v. Giordano, No. 11-CV-4507 (ARR)(5/4/2016, E.D.N.Y. , Ross, J.)*. Clearly he was a paralegal under the terms of my retainer, the Common Interest Agreement, and specific identification in *Exhibit 4*.

The determination of the scope of a waiver of the attorney-client and work-product privileges "lies within the sound discretion of the district court." *Financial Guar. Ins. Co. v. The Putnam Advisory Co., LLC, #12-civ-7232 (2/26/2016, S.D.N.Y., Sweet, J.).*  Under *Federal Rule of Evidence 502(a)*, a disclosure of privileged information only extends to undisclosed materials if 1) the waiver was intentional, 2) the disclosed and undisclosed communications or information concern the same subject matter, and 3) they ought in fairness to be considered together. *Id.* Here, the disclosure of information by the client to Hyman was intentional, but under the belief that it was being made to a paralegal, not some outside contractor or consultant which would vitiate the privilege. As such, Plaintiffs fail to satisfy the first prong of the test. They fail the second prong as all of the communications which they seek to compel disclosure of relate to the RICO case, not issues in the instant BJEC action.  Further, the communications disclosed by West End involving Hyman do not concern the same subject matter in BJEC as Hyman did not conduct legal research or perform specific tasks that touch upon both cases. The Court should not reach the third prong as Plaintiffs suffer no inequitable information deprivation from being denied the bounty of their far flung fishing expedition motion.  The communications with the clients during the RICO case do not relate to any of the issues presented in this case. As such, balancing the equities, the municipalities are far more harmed, than the Plaintiffs are benefitted, by compelling disclosure of all of the privileged communications had with Hyman.

Should the Court be inclined to probe the facts more deeply, it will find that painting in broad strokes without colorable claim, Plaintiffs fail not only to make that 'highly persuasive showing' of need, but also fail to make an adequate showing of waiver of the attorney client or work product privilege required under the *Martin* case to justify such drastic relief. Case law suggests that outside of tax cases, information shared with outside consultants, even if deemed a waiver of the attorney client privilege, is not deemed a waiver of the attorney work product privilege thereby preventing further disclosure beyond the consultant even if the attorney client privilege is vitiated. *U.S. v. Textron Inc. and Subsidiaries, 557 F.3d 21,25 (1st Cir. 2009)*. Therefore, regardless of whether the compelled disclosures by West End vitiated the attorney client privilege, the attorney work product privilege remains in tact and should prevent further disclosure thus defeating the instant motion.  Unless and until Plaintiffs can make a highly persuasive showing of need for the privilege materials in Mr. Hyman's possession, the motion should be denied and his deposition ordered to go forward without any waiver of the attorney client or attorney work product privileges.

Respectfully submitted,

David C. Holland, Esq.

Biltmore Plaza  - 155 East 29th Street  - Suite 12G  -  New York, New York 10016
Phone 212-842-2480  -  DCH@HollandLitigation.com  - 917-591-4555 Fax